IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

SHARRON BESSENT,

      Plaintiff,

v.                                No. 04-2522 B

DYERSBURG STATE COMMUNITY COLLEGE
and DR. KAREN BOWYER, Individually and in
her official capacity as President of Dyersburg
State Community College,

      Defendants.

_____

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
_____

INTRODUCTION

This lawsuit has been brought by the Plaintiff, Sharron Bessent, against her former employer,

Dyersburg State Community College ("DSCC") and Dr. Karen Bowyer, individually and in her

capacity as DSCC President, alleging, pursuant to 42 U.S.C. §§ 1983 and 1988,[1] violation of her

rights under the First, Fifth and Fourteenth Amendments.  The Defendants seek summary judgment

under Rule 56 of the Federal Rules of Civil Procedure as to all claims.

STANDARD OF REVIEW

Rule 56© provides that a

_____

[1]Section 1988 permits an award of attorney's fees to a prevailing party in a civil rights action.  See Gregory v. Shelby County, Tenn., 220 F.3d 433, 446-47 (6th Cir. 2000).  Although the Plaintiff has not elaborated on her § 1988 claim, the Court assumes the Plaintiff in making allegations under the statute merely intended to reserve her right to seek attorney's fees should she succeed on the merits.  See Board of Tr. Sabis Int'l Sch. v. Montgomery, 205 F.Supp.2d 835, 853 n.12 (S.D. Ohio 2002).  Based on the Court's ruling herein granting summary judgment and dismissing this matter, the Court GRANTS the Defendants' motion for summary judgment as to Plaintiff's claim under § 1988.

> . . . judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56©; see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir. 1988).  In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on her pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324, 106 S.Ct. at 2553.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S.Ct. at 1356.  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322, 106 S.Ct. at 2552. In this circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action."  Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)).  The "judge may not make credibility determinations or weigh the evidence."  Adams v. Metiva, 31

F.3d 375, 379 (6th Cir. 1994).

## FACTS AND PROCEDURAL BACKGROUND

According to her complaint,[2] Bessent founded the Dyer County Literacy Program (the "DCLP") in 1986 as a Volunteer in Service to America community-based agency to combat adult illiteracy in Dyer County, Tennessee. It was incorporated the following year as a non-profit corporation with a volunteer board of directors and was privately funded through community donations. The organization's mission was to "teach non and/or low level adults to read and write and perform math skills at a level that would enable them to be productive, successful citizens, recruit and train tutors in reading and math, promote community awareness, and rally the community in Dyer County to support the effort of adult literacy." (Compl. at 2.)

In 1991, the State of Tennessee allocated funding for full-time county adult education programs. The DCLP board applied for and received an adult education grant for Dyer County from 1992 through 1997. In 1997, the board decided to apply for the grant and, in addition, bring in another entity to partner with the literacy program and act as fiscal agent for the state grant while the DCLP board acted as administrator. To that end, in June of 1997, Bessent met with Defendant Bowyer, president of DSCC, in order to determine whether her educational institution would be interested in the project. Bowyer agreed that DSCC would act as fiscal agent if DCLP would take responsibility for a grant match, provide facilities for classes, hire and supervise teachers and employees, accept responsibility for in-service training, and administer the state grant. From 1997 to 2001, DCLP remained a separate entity from DSCC, although DCLP employees were required

---

[2] Even though the motion before the Court is one for summary judgment, the facts set forth herein are, unless otherwise stated, as alleged in the Plaintiff's complaint merely for the sake of simplicity.

to execute employment contracts with the college pursuant to its request in light of its position as fiscal agent.  According to the Plaintiff, she was asked only to provide an hourly rate for employees receiving grant funds and complete time sheets for part-time employees, travel forms for in-service training, and other forms necessary for the purchase of materials to be paid under the state grant. Bessent avers that she took direction exclusively from the DCLP's board of directors and the state adult education department.  She denies receiving any instruction from anyone at DSCC with respect to procedures, policies or guidelines issued by the Tennessee Board of Regents that might have applied to her.

In late 2002, DSCC initiated an audit of the adult education program arising from complaints of a disgruntled employee charging inappropriate overtime, falsification of time sheets and client numbers, as well as other fabrications.  The college also informed the Plaintiff that it would assume control over the private funds taken in by DCLP's board.  Bessent was vocal in her resistance to the move, arguing that consolidation of the program and the college would have a detrimental effect on services provided by the literacy program.

The Plaintiff charges that, as a result of her opposition, Bowyer instigated a plan to get rid of her by directing auditors to apply to the program state board of regent guidelines with which it did not, and with which it was not required to, comply.  Bessent also alleges that, during the audit process, Bowyer instructed DSCC officials to falsely accuse her of mismanagement of funds, falsification of time records, and fabrication of financial records.  The Plaintiff avers that, at that same time, Bowyer influenced sympathetic DCLP board members connected to the college to move the program under the Defendant's direct control using false portrayals of Bessent as incompetent and guilty of mishandling funds for personal gain.  According to the Plaintiff, Bowyer arranged to

have her employment placed on "probationary" status which enabled her to terminate the Plaintiff without the protections of her employment contract. On November 14, 2003, Bessent was terminated and informed by Bowyer that the decision was not appealable.

In the instant action, the Plaintiff contends that the Defendants (1) retaliated against her for exercising her First Amendment rights, (2) violated her right to substantive due process and (3) deprived her of liberty and property interests absent procedural due process. In her response to the dispositive motion, the Plaintiff advises the Court that she agrees to dismiss with prejudice the substantive due process claim and the procedural due process cause based on deprivation of property. Accordingly, those claims are hereby DISMISSED with prejudice. This opinion will, therefore, address only the remaining claims, that is, those brought under the First Amendment and for violation of the Plaintiff's right to procedural due process predicated on deprivation of liberty under the Fourteenth Amendment.

## LAW AND ANALYSIS OF PLAINTIFF'S CLAIMS

A.   42 U.S.C. § 1983.

   I.   Generally.

Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983. In order to prevail on such a claim, a § 1983 plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003). "Section 1983 is not the source of any substantive right, but merely provides a method for vindicating federal rights

5

elsewhere conferred."  Humes v. Gilless, 154 F.Supp.2d 1353, 1357 (W.D. Tenn. 2001).

II.     First Amendment Claim.

The First Amendment protects the rights of government employees to comment on matters of public concern without reprisal from their employers.  Dambrot v. Central Mich. Univ., 55 F.3d 1177, 1185 (6th Cir. 1995).  In order to establish a claim for First Amendment retaliation under § 1983, a plaintiff must show that "(1) [she] was engaged in a constitutionally protected activity; (2) [she] was subjected to adverse action or deprived of some benefit; and (3) the protected speech was a 'substantial' or 'motivating factor' in the adverse action."  Farhat v. Jopke, 370 F.3d 580, 588 (6th Cir. 2004) (citation omitted).

> The framework for analyzing a First Amendment retaliation case is well-established. . . . While public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment, a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions.  Therefore, in determining whether a public employer has violated the First Amendment by firing a public employee for engaging in speech, the Supreme Court has instructed courts to engage in a three-step inquiry.  First, a court must ascertain whether the relevant speech addressed a matter of public concern.  If the answer is yes, then the court must balance the interests of the public employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.  Finally, the court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee.

Id. (internal citations and quotation marks omitted).

The threshold inquiry is whether the speech at issue addressed "a matter of public concern." Rodgers v. Banks, 344 F.3d 587, 596 (6th Cir. 2003), reh'g and suggestion for reh'g en banc denied (Nov. 5, 2003).  "Whether the speech at issue involves a matter of public concern is a question of law for the court, although there may be some factual questions for a jury if it is disputed whether the expression occurred or what words were specifically stated."  Farhat, 370 F.3d at 589 (internal

6

citation omitted).  If the Court finds the Plaintiff's speech did not address a matter of public concern, summary judgment is appropriate with no further inquiry.  Rahn v. Drake Ctr., Inc., 31 F.3d 407, 411 (6th Cir. 1994), cert. denied, 515 U.S. 1142, 115 S.Ct. 2578, 132 L.Ed.2d 828 (1995).  On the other hand, if "any part of an employee's speech, which contributes to the discharge, relates to matters of public concern, the court must conduct" the balancing of interests test articulated in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).  Id.

In the instant motion, it is the Defendant's position that Bessent's statements were not sufficient to satisfy the threshold inquiry.  As a panel of the Sixth Circuit observed in  Buckley v. City of Portage, No. 98-1783, 1999 WL 777542, *3 (6th Cir. Sept. 16, 1999), cert. denied, 530 U.S. 1262, 120 S.Ct. 2719, 147 L.Ed.2d 984 (2000), "[t]he line between protected and unprotected employee speech is often difficult to draw in practice.  At first blush, nearly everything a government employee says about the entity [she] serves would appear to be a matter of concern to the public."  See also Banks v. Wolfe County Bd. of Educ., 330 F.3d 888, 893 (6th Cir. 2003) (recognizing difficulty in determining whether speech is protected or unprotected).  The Supreme Court, however, has rejected such a broad interpretation of "protected" speech.  In Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Court cautioned that

> [w]hen employee expression cannot be fairly considered as relating to any  matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.  Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.

Connick, 461 U.S. at 146, 103 S.Ct. at 1690 (citations omitted).  "[S]peech falling into this [protected speech] category includes informing the public that a governmental entity failed to

discharge its governmental responsibilities or bringing to light actual or potential wrongdoing or breach of public trust on the part of a governmental entity or any officials therein." Rodgers, 344 F.3d at 596 (citing Connick, 461 U.S. at 148, 103 S.Ct. 1684). The employee "must be speaking as a citizen, not as an employee for personal interest purposes." Id. "Thus, internal personnel disputes or complaints about an employer's performance do not touch upon a matter of public concern and therefore fall outside the scope of First Amendment-protected speech." Id. (citing Brandenburg v. Housing Auth. of Irvine, 253 F.3d 891, 898 (6th Cir. 2001)) (internal quotation marks omitted). Therefore, generally speaking, "speech involves matters of public concern when it involves 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'" Banks, 330 F.3d at 893 (quoting Brandenburg, 253 F.3d at 898). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48, 103 S.Ct. at 1690. Furthermore, such determinations are to be made on a case-by-case basis. Akers v. McGinnis, 352 F.3d 1030, 1037 (6th Cir. 2003), cert. denied, 543 U.S. 1020, 125 S.Ct. 656, 160 L.Ed.2d 495 (2004).

As the court articulated in Farhat,

[a]gainst the background of Connick and [principles developed by the Sixth Circuit in subsequent cases], our circuit has distilled the "public concern" test by stating that the court must determine:  the "focus" of the speech; "the point of the speech in question"; "to what purpose the employee spoke"; "the intent of the speech"; or "the communicative purpose of the speaker."

As a corollary to this "focus" test, we have held that the proper inquiry is *not* what might be "incidentally conveyed" by the speech, and that "passing" or "fleeting" references to an arguably public matter do not elevate the speech to a matter of "public concern" where the "focus" or "point" of the speech advances only a private interest.

Farhat, 370 F.3d at 592-93 (internal citations omitted) (emphasis in original).  The Sixth Circuit has also explained that "the point of the protection afforded public employees is to allow public employees a voice on issues actually affecting and interesting the community at large." Banks, 330 F.3d at 897 (citing Gragg v. Kentucky Cabinet for Workforce Dev., 289 F.3d 958, 966 (6th Cir. 2002)).

Bessent's statements were made in opposition to a merger of the literacy program and DSCC. The primary basis for her objection was her belief that a merger would lead to a private funding shortfall because donors who gave to both the college and the literacy program would then give to only one consolidated entity.  She also foresaw an increase in costs as the program would be responsible for compliance with Tennessee Board of Regents rules and regulations.  Although the Plaintiff does not in her response specifically enumerate the statements she contends constituted matters of public concern, she does not appear to take issue with those identified in the Defendants' motion.  Those statements, gleaned from the Plaintiff during discovery, are as follows.

> I cooperated fully with DSCC as they tried to determine which contracts should be used for DCLP employees paid through DSCC.  There was much confusion and changes in DSCC's determining the contract.  As I was meeting in the HR office (DSCC) with Judy Fowlkes, Assistant HR Director, to redo the contracts (once again), Mitch Robinson, DSCC VI of Finance and Administration, ordered me to accept the fact that DSCC would be taking over the private monies.  It was at this point that I began to back away and express my doubts about this being the [sic] for the good of the DCLP.

> On December 6, 2002, I met with DCLP board of directors, Chuck Priest, Tracy Liddell, Mary Elliott, Rob Kerr and Rose Clardy.  This was the first meeting with any  DCLP board members because Mitch Robinson strongly advised me not to contact them.  After his threat, I felt the need to have them work on the problem.  I expressed my opinion to Mitch and these board members that I didn't think it would benefit the private program to come under DSCC.  These board members agreed until the full DCLP board meeting on December 11, 2002, when John Lannom (attorney and newly elected board member) took full control and moved the direction of standing alone as a private program to a full investigation of me, DCLP financial

books and a series of private meetings which excluded me.

Between January and May, 2003, I talked extensively with David Lolles, who took Mitch Robinson's position at DSCC.  I [sic] very candid in my beliefs that DCLP would suffer if DSCC took over the program.  I was led to believe, by Chuck Priest, DCLP Board President, that no decision or even hint had been made by the DCLP board that DCLP would go with DSCC. . . .

I set a board meeting for May 28, 2003.  It was at this meeting that I strongly expressed my opinions of the merger.  Dr. Bowyer was invited to this meeting by John Lannom.  She brought Leah Orr, Polly Gregory and Jule Frazier from DSCC to accompany her.  I was not told they would be there.  David Lolles, Buck Tarpley and Dr. Bowyer, from DSCC, were present in the meeting when I expressed my opinion of the merger and the underhanded tactics used.  David Lolles later told me how angry Dr. Bowyer was at me and at him for not handling me better.

(Not. of Filing, Ex. 1 (Pl.'s Resp. to Def. Dr. Karen Bowyer's First Set of Interrogs. and Req. for

Prod. of Docs.) at 5-6.)

March 13, 2003 meeting at John Lannom's law office.  Present:  Chuck Priest, Ellen More, Chris Rimel, Bill Cloar, Hugh Todd, Nancy Hardin, Nita Jones, Buck Tarpley, John Lannom, Rose Clardy and me.  This was the first meeting Rose Clardy and I were invited to after the secret meeting when they decided to let DSCC take over.  Several expressed concerns for additional cost:  Hugh Todd, Nancy Hardin, Bill Cloar, Rose Clardy. . . . The majority agreed there would be no way to abide by state guidelines and not cost more money.

(Bessent Dep., Ex. 1 (Pl.'s Resp. to Def. Dyersburg St. Community Coll.'s First Set of Interrogs and

Req. for Prod. of Docs. ("Response to Dyersburg Interrogatories")) at 15-16.)

May 28, 2003, DCLP Board Meeting . . . I expressed the same facts above plus the fact that we had been trying to work out a plan since January 2003, and DSCC still didn't know where or how to fit us in. . . .

I believe I mentioned my suspicions that DSCC was building a case against me to get rid of me as soon as they gained control.  The reason:  the community viewed me and the literacy program as one . . .

(Response to Dyersburg Interrogatories at 13.)

August 25, 2003 - Dr. Bowyer, David Lolles, Nancy Hardin and Rose Clardy.  Dr. Bowyer expressed concern about the board not raising funds like before.  I told her

I knew it would hurt our private contributions to merge with DSCC. She was furious with me and said, "We're just trying to keep you out of jail."

(Response to Dyersburg Interrogatories at 7.)

October, 2003, met at DSCC for Budget Meeting. Those present: Hugh Todd, DCLP; Nancy Hardin, DCLP; Rose Clardy, DCLP; Leah Orr, DSCC; Polly Gregory, DSCC; Kay Patterson, DSCC; and me.

After 10 months, we were still trying to figure out how to make this merger work. Since the board was supposed to be in charge of fundraising, contributions had dropped significantly plus the $14,000+ debt the board ran up under John Lannom's leadership was looming overhead and DSCC still hadn't figured out how to pay our teachers with all of the additional costs. Anytime I made a suggestion, I was shot down by DSCC employees. . . .

After a couple of hours of getting nowhere, I made the comment that we might have to come to the conclusion that this wouldn't work and go our separate ways. DSCC employees just looked at each other and made no comment.

(Response to Dyersburg Interrogatories at 14.)

At the November 4, 2003 board meeting, I reported on my visit to Chattanooga State to view how they ran their adult education program through the college. My findings were that they ran it in partnership with the private literacy program much like we had in the past without the additional TBR expenses. Dr. Bowyer was furious with me, especially when Hugh Todd agreed that the TBR regs were our biggest costs.

(Response to Dyersburg Interrogatories at 7.)

In support of their contentions, the Defendants refer the Court to the Sixth Circuit's decision in Rahn. In that case, the plaintiff, a nurse, worked for a hospital owned by a political subdivision of the State of Ohio. Rahn, 31 F.3d at 408. During her employment, the hospital hired a new administrator, Earl Gilreath, to institute changes designed to regain the institution's accreditation and Medicare certification. Id. The following year, the hospital ceased operation and the facilities were leased to a private non-profit corporation as a result of the new administrator's efforts. Id. at 408-09. As part of an agreement, the political subdivision, Hamilton County, agreed to work toward passage

11

of a tax levy and to transfer the proceeds thereof to the new facility, Drake Center.  Id. at 409.

Gilreath became president of the Drake Center and former hospital employees, including the

plaintiff, were required to apply for jobs at the facility.  Id.  Rahn, who applied for and obtained a

position at the Drake Center, was later fired under her employer's absentee policy.  Id. at 409-10.


Days before her termination, the plaintiff, as chairman of the Committee to Maintain and

Improve Drake Hospital, issued a press release criticizing Gilreath and stating, among other things,

that,

> [t]he question is, did the citizens vote for a private country-club like facility lavishly
> landscaped with expensive flowers after Mr. Gilreath had previously ordered all
> existing plantings removed for the front of his hospital or a facility to provide long-
> term care and therapy for the more needy citizens of Hamilton County?
>
> *       *       *
>
> This Committee hopes for clarification and the reasons for actions in the following
> areas:
>
> (1) New work rules which have caused widespread discontent among the hospital
> staff which has created a high absenteeism, possibly developing a patient
> endangerment situation.

Id. at 410.

It was the argument of the plaintiff in Rahn before the appellate court that her statements to

the effect that Gilreath was going to spend taxpayer money in ways not necessarily beneficial to the

public and that new rules might result in patient endangerment rendered them "matters of public

concern."  Id. at 412.  In applying the law to the facts before it, the court found that

> the fact that Rahn believed that the money was not being spent in a wise fashion, by
> itself, is insufficient to find that the press release addressed a matter of public
> concern.  In addition, the reference to "patient endangerment" does not make this a
> matter of public concern under the facts in this case. . . . The focus of the [new work

rules] comment is not on patient endangerment arising from the misapplication of tax dollars; rather, the focus is on the employees' discontent with new *work* rules which *might* lead to a patient endangerment situation.  This is nothing more than an example of the quintessential employee beef:  management has acted incompetently.

Id. at 412-13 (citations and internal quotation marks omitted) (emphasis in original).

In reaching its decision, the Rahn court relied heavily on its 1988 determination in Barnes v. McDowell, 848 F.2d 725 (6th Cir. 1988), cert. denied, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989), which is also instructive in this case.  In Barnes, the plaintiffs claimed that their former employer, the Kentucky bureau of the blind's business enterprises program, retaliated against them for complaining about certain business practices, including its failure to conduct regular audits resulting in underreporting of earnings by vendors, discrimination of totally blind vendors in favor of the partially blind, failure to request and obtain lack of higher appropriations from the state general assembly, and failure to investigate allegations of improper purchasing of repair parts for machines used in the program.  Barnes, 848 F.2d at 728 & n.4.  The court recognized that "[t]he mere fact that public monies and government efficiency are related to the subject of a public employee's speech do not, by themselves, qualify that speech as being addressed to a matter of public concern." Id. at 734.  However, the court continued, evidence showing that public funds were being used unwisely or that a government program was being operated in an inefficient manner might rise to the level of public concern if the speech disclosed public corruption.  Id.  On the facts before it, the court concluded that the complaints amounted to no more than alleged management incompetence and, thus, did not address a matter of public concern sufficient to sustain a First Amendment retaliation claim.  Id. at 734-35.

By way of response, the Plaintiff insists that a well-funded and efficient literacy program is clearly a matter of public concern.  Shortfalls in funding and operational issues relative to the

13

program were, as a consequence, protected.  In support of her position, Bessent cites to <u>Chappel v.</u>
<u>Montgomery County Fire Protection District No. 1</u>, 131 F.3d 564 (6th Cir. 1997).  In <u>Chappel</u>, the
plaintiff worked for the defendant as an emergency medical technician and was studying on his own
to be a paramedic.  <u>Chappel</u>, 131 F.3d at 567.  At that time, the county's fire and ambulance services
did not employ licensed paramedics.  <u>Id.</u> at 567-68.  Chappel began to voice concerns to fire and
ambulance board members, the state auditor's office and county officials about the importance of
a paramedic service as well as alleged failures to maintain adequate debt collection procedures, the
lack of adequate training for fire district employees, and nepotism and misappropriation of funds on
the part of the fire chief's family.  <u>Id.</u> at 568-69.  In determining whether Chappel's speech was
protected as a "matter of public concern," the court concluded that "matters of public safety," the
"gross mismanagement and misappropriation of public monies," the implementation of paramedic
service, and the need for improved training were clearly of public concern.  <u>Id.</u> at 578-79.  The court
also decided that

> Chappel's criticism of the ambulance district's financial problems was a matter of
> public concern.  This is not a case where the criticism of minor inefficiencies is held
> up as a matter of public concern simply because the public fisc is implicated.  Rather,
> Chappel's speech addressed a critical revenue-shortfall deriving from a basic failure
> to collect debts and properly manage the ambulance district's budget.  Furthermore,
> Chappel's speech linked this financial failure to deficiencies in the ambulance
> district's provision of lifesaving services.
>
> Chappel's speech alleging that [the fire chief] and his family members were
> misappropriating public monies is obviously a matter of public concern.
> Furthermore, it is clear, in light of these particular allegations of corruption and
> Chappel's additional speech blaming [one family member in particular] for the
> ambulance district's financial woes, that Chappel's speech regarding [the fire chief's]
> alleged nepotism and conflict of interest was speech on a matter of public concern.
> In essence, Chappel's speech alleged that [the fire chief's] favoritism for his family
> resulted in the payment of unearned benefits and the gross mismanagement of the
> ambulance district's finances.  In this context, that is, [the fire chief] being charged
> with corruption and nepotism, Chappel's suggestion that [the fire chief] should not

14

> serve as both fire chief and chairman of the fire board was also obviously a matter
> of public concern.

Id. at 579.  Chappel is distinguishable from the case at bar as the facts present therein were far more
egregious than those proffered in this case.  The Plaintiff here has made no allegations of corruption
or nepotism, nor of any illegal activities on the part of the Defendants.

Viewing the statements at issue in the light most favorable to the Plaintiff, and reviewing the
record as a whole, it appears to the Court that the focus of the speech centered on an internal power
struggle over control of a program that was obviously important to Bessent and with which, in her
eyes, the community associated her.  As well, she was concerned with the added expenses which
could be imposed based upon additional state guidelines..  The speech did not, in this Court's view,
touch on matters of public concern.  See Rahn, 31 F.3d at 411 (upon finding a plaintiff's speech did
not address a matter of public concern, summary judgment is appropriate without further inquiry).
Any indirect reference to the effect on the public of converting the agency to one operated under the
auspices of the state was incidental.  As the Supreme Court stated in Connick,

> [t]o presume that all matters which transpire within a government office are of public
> concern would mean that virtually every remark--and certainly every criticism
> directed at a public official--would plant the seed of a constitutional case.  While as
> a matter of good judgment, public officials should be receptive to constructive
> criticism offered by their employees, the First Amendment does not require a public
> office to be run as a roundtable for employee complaints over internal office affairs.

Connick, 461 U.S. at 149, 103 S.Ct. 1691.

III.     Procedural Due Process.

It is also the contention of the Plaintiff that the Defendants deprived her of liberty without
due process by failing to provide her with a name-clearing hearing and, thereby, prohibiting her from
appealing the termination of her employment.  The Fourteenth Amendment prohibits deprivation

of life, liberty or property without due process of law.  "A person's reputation, good name, honor,

and integrity are among the liberty interests protected by the due process clause of the fourteenth

amendment."  Quinn v. Shirey, 293 F.3d 315, 319 (6th Cir.), cert. denied 537 U.S. 1019, 123 S.Ct.

538, 154 L.Ed.2d 426 (2002) (quoting Chilingirian v. Boris, 882 F.2d 200, 205 (6th Cir. 1989)).

Defamation alone, however, is insufficient to support a claim.  Id.  Rather, "[s]ome alteration of a

right or status previously recognized by state law, such as employment, must accompany the damage

to reputation."  Id. (citing Paul v. Davis, 424 U.S. 693, 711-12, 96 S.Ct. 1155, 47 L.Ed.2d 405

(1976)) (internal quotation marks omitted).  Thus, when an "employee shows that [s]he has been

stigmatized by the voluntary, public dissemination of false information in the course of a decision

to terminate [her] employment, the employer is required to afford [her] an opportunity to clear [her]

name."  Id. at 320 (quoting Chilingirian, 882 F.2d at 205).

This Circuit has identified five elements that must be shown in so-called "name-clearing"

cases:

> First, the stigmatizing statements must be made in conjunction with the plaintiff's
> termination from employment.  Second, a plaintiff is not deprived of [her] liberty
> interest when the employer has alleged merely improper or inadequate performance,
> incompetence, neglect of duty or malfeasance.  Third, the stigmatizing statements or
> charges must be made public.  Fourth, the plaintiff must claim that the charges made
> against [her] were false.  Lastly, the public dissemination must have been voluntary.

Id. (citing Brown v. City of Niota, 214 F.3d 718, 722-23 (6th Cir. 2000)).  "Once a plaintiff has

established the existence of all five elements, [she] is entitled to a name-clearing hearing if [she]

requests one.  It is the denial of the name-clearing hearing that causes the deprivation of the liberty

interest without due process."  Id. (internal citation omitted).  Consequently, in order to survive

summary judgment on her Fourteenth Amendment claim, Bessent must demonstrate all of the

elements listed above.

16

The Defendants have focused on the second and third elements, that is, that the statements did not rise to the level of a liberty interest deprivation and that the stigmatizing charges must be made public.  The Court will first address the third element.

In response to written discovery concerning the sources of liberty interest due process claim, the Plaintiff identified the following:

> July 1, 2002-June 30, 2002; July 1, 2003-June 30, 2004, CLP Board President, Nancy Hardin asked Rose Clardy and me on several occasions if there was anything we weren't telling because Dr. Bowyer had said to her several times that she and the board didn't know everything and that she said it was some bad, serious things. Nancy felt like the board was scared not to go with DSCC, especially since John Lannom told them, in the board meetings I was excluded from, not to talk to me because I was under investigation, that as a board they could lose their homes, cars, savings, etc., because I had money in a couple of accounts he acted like I had it hidden out and it was not only unethical but poor management as well.
>
> David Lolles told me that John Lannom called him regularly but John never called or contacted me to ask questions about policy, management processes, or financial status.
>
> I was told by Nancy Hardin that it was said in those private meetings that the program had outgrown me causing the board to doubt my management skills. Martha Crites, CPA, was also told by Nancy that [it] was said the program outgrew me.  Someone from DSCC told the new DCLP director that the program outgrew me. Beth Feith, DCLP director, told Nancy Stevens this after coming back from [a] DSCC meeting.
>
> Dr. Bowyer said at several of our monthly meetings in the presence of David Lolles, Nancy Hardin, Rose Clardy and me that they were trying to keep me out of jail.
>
> Chuck Priest told me (per phone February, 2003) that John Lannom said I had committed a felony (falsifying time sheets) and could get a prison term for that. Luckily being a non-profit organization would keep me out of prison.
>
> Dr. Bowyer sent an e-mail attachment to the entire DSCC Admin. Board which was a copy of [Jule] Frazier's evaluation that stated what a good job she had done with the whistle-blower incident and dealing with all the personalities.  I don't believe this was an accident, it was meant to humiliate me.  Those aware of this:  David Lolles, Hugh Todd, Nancy Hardin, Rose Clardy and the whole DSCC Admin. Council.

November 3, 2003 board meeting at DCLP Learning Center - Dr. Bowyer placed the blame on me for making out the budget and it being short even though the discussion was on the extra expense of TBR regulations.

August 26, 2002, first board meeting of new fiscal year.  Dr. Bowyer asked DA Phillip Bivens to come to the meeting and report on the findings against me from the Comptroller's Office.  He reported (in front of new members with no knowledge of what had happened) that I had committed a felony, that I wouldn't be prosecuted but that it was no less wrong.  He compared me to Shumaker at UT Knoxville.  Bowyer called Nancy Hardin the day before the meeting to okay DA coming and reporting. Public Defender Jim Horner asked the DA several days later why he did that and he said she wanted him to do more but he wouldn't.  Also, David Lolles said she had him in and out of the DA's office trying to get him to prosecute me.

December, 2003, Dr. Bowyer was quoted in an article on the front page of the local newspaper as saying DSCC decided to change management of the literacy program due to mismanagement of grants.  I had several friends call saying that sounded like I had stolen money.  Cris Rimel, DCLP board member, also publisher of [the] newspaper, was involved in trying to keep the audit/reports from me and supporting the takeover of DCLP.  He knew I had not mismanaged the grants.  He kept all stories out of the paper during the takeover period but published this one when they finally busted.  There were several letters on my behalf to the editor written right after the article which he didn't publish.

(Response to Dyersburg Interrogatories at 16-18.)

While the Plaintiff argues in her response to the motion that "allegations were published by Bivens at the behest of Defendants at a *public* meeting of the board," she has failed to point to evidence that any of the board meetings referred to in her responses to discovery were in fact open to the public and the Court is not willing at this juncture to assume that is the case.  Therefore, the only charges or statements made public were those made by Bowyer in the newspaper.  The article stated that Bessent had been "dismissed from her post . . . following allegations of grant mismanagement."  (Notice of Filing, Disc. Dep. of Karen Bowyer, Ex. 21.)  The publication went on to quote Bowyer as stating that "[t]here were some recurring problems with the management of the grant, and we have decided to change the leadership of that program."  (Notice of Filing, Disc.

Dep. of Karen Bowyer, Ex. 21.)

The Plaintiff avers that the Defendants' allegations went beyond mere neglect of duty and constituted accusations that she committed crimes.  While that may have been so with respect to all of the statements allegedly made by the Defendants, the Court must limit its determination as to the second element of the name-clearing showing to those statements that were *made public*, which reported only that Bessent was dismissed because of allegations of mismanagement.

The Sixth Circuit has articulated that

> [a] charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation.  Rather, to implicate the Due Process Clause, the employer must have made a statement in the course of the employee's discharge "that might seriously damage [her] standing and associations in [her] community" or that might impose "on [her] a stigma or other disability that would foreclose [her] freedom to take advantage of other employment opportunities."  A moral stigma such as immorality or dishonesty is required to show a deprivation of liberty.

Ludwig v. Board of Tr. of Ferris State Univ., 123 F.3d 404, 410 (6th Cir. 1997) (citing Board of Regents of State Colls. v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972)) (internal citations and quotation marks omitted).  Similarly, "[w]hen a state fires an employee for stated reasons likely to make [her] all but unemployable in the future, by marking [her] as one who lost [her] job because of dishonesty or other job-related moral turpitude, the consequences are so nearly those of formally excluding [her] from [her] occupation that the law treats the state's action the same way, and insists that due process be provided."  Lisle v. Metropolitan Gov't of Nashville and Davidson County, Tenn., 73 F.App'x 782, 788 (6th Cir. 2003) (citing Lawson v. Sheriff of Tippecanoe County, 725 F.2d 1136, 1138 (7th Cir.1984) (Posner, J.) and Joelson v. United States, 86 F.3d 1413, 1420 (6th Cir.1996)).

Based on the evidence presented, the Court finds that the Plaintiff has failed to show that the

19

statements contained in the newspaper article were anything more than charges of "improper or inadequate performance, incompetence, neglect of duty or malfeasance."  Although it appears the Sixth Circuit has not spoken specifically on the question of whether an allegation of "mismanagement" rises to the level of a "stigmatizing statement," "the Seventh Circuit has taken the position that a mere charge of mismanagement is not enough to give rise to a liberty interest requiring a hearing.  An unelaborated charge of 'incompetence, neglect of duty and malfeasance of office' is of a different order of magnitude than charges of dishonesty, immorality, disloyalty, Communism, subversive activities, alcoholism or narcotics violations.  Liberty is not infringed by a label of incompetence or a failure to meet a specific level of management skills, which would only affect one's professional life and force one down a few notches in the professional hierarchy."  Ulichny v. Merton Cmty. Sch. Dist., 93 F.Supp.2d 1011, 1036 (E.D. Wis. 2000), aff'd, 249 F.3d 686 (7th Cir. 2001) (citing cases) (internal citations omitted).

        In addition, Bessent has failed to produce evidence demonstrating that she has been, as a result of the public dissemination, barred from taking advantage of employment opportunities.  Indeed, she admits in her response to the Defendants' statement of undisputed facts that she is currently employed as an insurance agent by Liberty National Insurance Company and that she sat on the Tennessee Literacy Coalition Board of Directors as its 2004-2005 President.  See Lake Mich. Coll. Fed'n of Teachers v. Lake Mich. Cmty Coll., 518 F.2d 1091, 1096-97 (6th Cir. 1975), cert. denied, 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1197 (1976) (no due process violation where plaintiffs were not barred from other employment).  Nor has the Plaintiff referred the Court to evidence that she has been barred from obtaining employment in conducting a literacy program.  Accordingly, the Plaintiff was not entitled to a name-clearing hearing and summary judgment is

appropriate.  See Farkas v. Ross-Lee, 727 F.Supp. 1098, 1106 (W.D. Mich.), aff'd, 891 F.2d 290 (6th

Cir. 1989) (summary judgment warranted where plaintiff failed to plead or demonstrate existence of

a genuine issue of fact that a definite range of jobs was no longer open); see also Quinn, 293 F.3d at

319 (in order for plaintiff to be entitled to name-clearing hearing, all elements of the claim must be

present).

<u>CONCLUSION</u>

  For the reasons set forth herein, the motion for summary judgment is GRANTED and the

Plaintiff's claims are DISMISSED.  The Clerk of Court is directed to enter judgment for the

Defendants.  Any and all other pending motions in this matter are DENIED as moot and the Court's

case manager is directed to remove all settings herein from the Court's calendar.

  IT IS SO ORDERED this 13th day of February, 2006.


      s/ J. DANIEL BREEN
      UNITED STATES DISTRICT JUDGE